**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| TAMERA DYSART,<br><br>      Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL,[1]<br>Acting Commissioner of the Social Security<br>Administration,<br><br>      Defendant. | Case No. 4:16-cv-00410-GBC<br><br>(MAGISTRATE JUDGE COHN)<br><br>OPINION AND ORDER TO<br>GRANT PLAINTIFF'S APPEAL |

## OPINION AND ORDER

### I.    Procedural Background

On February November 5, 2013, Tamera Dysart ("Plaintiff") filed as a claimant for disability benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-433, 1382-1383 ("Act"), with a last insured date of September 30, 2017,[2] and claimed a disability onset date of May 12, 2013. (Administrative Transcript (hereinafter, "Tr."), 12). On August 13, 2015, the administrative law judge ("ALJ") found that Plaintiff was not disabled within the meaning of the Act. (Tr. 9-33). On May 16, 2016, the Appeals Council denied Plaintiff's request for review, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner of the Social Security Administration ("SSA"). (Tr. 1-5).

---

[1] Effective January 23, 2017, Nancy A. Berryhill replaced Carolyn W. Colvin as Acting Commissioner of the Social Security Administration ("SSA") and is substituted as defendant in this action pursuant to Federal Rule of Civil Procedure 25(d).

[2] Disability insurance benefits ("DIB") are paid to an individual if that individual is disabled by last date that a claimant meets the requirements of being insured. See 42 U.S.C. § 423(a)(1)(A), (c)(1).

On June 28, 2016, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) to appeal a decision of Defendant denying social security benefits. (Doc. 1). On October 11, 2016, Defendant filed the administrative transcript of proceedings. (Doc. 14). On December 13, 2016, Plaintiff filed a brief in support of the appeal. (Doc. 15) ("Pl. Br.")). On February 6, 2017, Defendant filed a brief in response. (Doc. 18 ("Def. Br.")). On February 27, 2017, Plaintiff filed a reply brief. (Doc. 19 ("Reply")). On May 10, 2017, the Court referred this case to the undersigned Magistrate Judge.

## II.    Facts in the Record[3]

### A.    Background

Plaintiff was born in July 1959 and thus was classified by the regulations as a person of advanced age through the date of the ALJ decision. (Tr. 111); 20 C.F.R. § 404.1563(e).

Plaintiff completed the twelfth grade, completed a tax course in 1977 at a business and tax institute, and co-owned a business where she did bookkeeping and tax preparation. (Tr. 252). Since joining the family bookkeeping and tax preparation business in 1977, Plaintiff's work in general accounting and tax preparation included: (1) using a "computer or use a ten-key adding machine at least 6 hours a day during tax season"; (2) copying and proof reading; (3) interviewing clients and recording their information; (4) maintaining monthly bookkeeping accounts with profit/loss reports and sales tax and payroll reports, and; (5) attending fifteen hours of continuing education. (Tr. 253). Plaintiff lives with her husband who receives disability.[4] (Tr. 52).

---

[3] In the August 2015 decision, the ALJ stated that "counsel failed to submit the requested medical records from Mercy Hospital." (Tr. 12). The undersigned notes that "[a]n individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require." 42 U.S.C. § 423(d)(5)(A) (2004).

[4] Plaintiff testified that "[f]unctionally, [her husband] has no legs. He has dead legs. . . he's gone progressively from walking with a limp, and a cane, to now in a wheel chair." (Tr. 52).

Earnings reports demonstrate that Plaintiff: (1) did not meet the earning threshold for any quarters of coverage[5] in 1991 and 2014; (2) in 1996 ($640 annual income), 1997 ($1,545 annual income), 2004 ($1,955 annual income), and 2005 ($1,917 annual income), met the earning threshold for one to two quarters of coverage; from 1987 to 1990 (annual income between $2,314 and $3,768), 1992 to 1995 (annual income between $3,507 and $7,542), 1998 to 2003 (annual income between $2,527 and $3,780), and 2006 to 2013, met the earning threshold for three to four quarters of coverage, with the average annual income for those eight years totaling $ 6,746.63. (Tr. 195-200).[6]

## B.    Treatment History and Medical Opinions

### 1.   Mercy St. John Neurology: Nitin K. Sharma, M.D.

On June 18, 2013, Dr. Sharma noted that Plaintiff fell and hit her head in the bathroom on May 13, 2013, without a loss of consciousness, followed by hitting her head on a dresser table corner at the same part of her head without any loss of consciousness. (Tr. 345). Dr. Sharma noted that the CT of the brain was negative and since the falls, Plaintiff reported experiencing "unilateral throbbing headache with visual disturbances," intermittent upper extremity weakness with paresthesia, double vision, dizziness, forgetfulness, confusion, and difficulties with sleep and

---

[5] In a claimant's earnings record, a "c" indicates that a claimant has earned enough to qualify for a quarter of coverage and an "n" indicates that the threshold amount was not earned in a given quarter. See "Insured status," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 4:2 (2nd ed.). For example, in 2000, "cccc" would indicate that a claimant has earned at least $780 each quarter of 2000 and "cccn" would indicate that a claimant earned at least $780 for the first three quarters of 2000. See "Quarter of Coverage," https://www.ssa.gov/OACT/COLA/QC.html (last accessed June 12, 2017) (listing required earning thresholds through 2017).

[6] The social security records indicate that Plaintiff earned $4,023 in 2013 and no earnings for 2014. (Tr. 196-200). However, upon review on tax records for the same years, the ALJ determined that Plaintiff earned $19,000 in 2013 and $15,000 in 2014 and noted that "[m]ost of the earnings were significantly depreciated in both years, so it is difficult to assess whether such earnings would constitute substantial gainful activity . . . ." (Tr. 14).

concentration. (Tr. 345). Upon examination Dr. Sharma noted that Plaintiff's: (1) coordination was normal, visual field was normal, right eye upper eyelid exhibited mild droopiness, facial muscle functions were normal; (2) reflexes were normal; (3) gait stable; (4) motor strength was 4 to 5/5; (5) sensory was normal, and; (6) mental status was unremarkable. (Tr. 346). Dr. Sharma assessed Plaintiff with: (1) closed head trauma with head concussion; (2) post-concussion headache with cognitive dysfunction; (3) acute migraines/vascular headache, and; (4) unremarkable brain MRI. (Tr. 346).

In a follow-up visit dated July 24, 2013, Dr. Sharma made similar examination findings as those made on June 18, 2013, and recommended that she continue with medicine regime of pamelor, naproxen, and imitrex. (Tr. 349-50). In a follow-up visit dated August 27, 2013, Dr. Sharma made similar examination findings as those made during the June 2013 and July 2013 visits. (Tr. 353). Dr. Sharma noted that Plaintiff's visual disturbances and migraine were improved and controlled and that her headache was "well controlled over pamelor/naproxen regime." (Tr. 353).

### 2.  Psychiatric Review Technique: G.R.L.,[7] Ph.D.; L.M.L., Ph.D.

On February 20, 2014, Dr. G.R.L. reviewed the records and opined that Plaintiff had: (1) mild restriction of activities of daily living; (2) mild difficulties in maintaining social functioning; (3) mild difficulties in maintaining concentration, persistence or pace, and; (4) no repeated episodes of decompensation, each of extended duration. (Tr. 115). Dr. G.R.L. opined that Plaintiff did not meet the criteria for Listings 12.04 (affective disorders) or 12.06 (anxiety-related disorders). (Tr. 115). In support for the opinion, Dr. G.R.L. noted Plaintiff's medical history, noted mental health records indicated that Plaintiff was doing well, Plaintiff's report of symptoms, and

---

[7] The agency reviewing psychologist is only identified in the record by initials.

cited an examination from November 2013 which noted no neurological symptoms, no confusion, no disorientation, and no psychological symptoms. (Tr. 115). Dr. G.R.L. noted (1) that a June 2013 record indicated unremarkable findings and negative MRI; (2) that a September 2013 record indicated that remote and recent memory was not impaired and no psychological symptoms; (3) that May 2013 and November 2013 CT scans and MRI were normal, and; (4) Plaintiff's report of ADLs which includes reading, watching TV, counting change, and socializing. (Tr. 116).

On July 10, 2014, Dr. L.M.L. reviewed the records and made identical findings and provided identical explanation and summary of the evidence as provided in Dr. G.R.L.'s February 2014 Psychiatric Review Technique. Compare (Tr. 113-116) with (Tr. 122-27). Dr. L.M.L. reviewed additional evidence which included a June 2014 examination where Plaintiff reported becoming more depressed due to her tremors, and a review of symptoms indicated that there were no psychological symptoms, no anxiety, and no depression. (Tr. 127). Dr. L.M.L. noted that Plaintiff reported that her memory was still impaired, claimed that mentally she was fine but has some depression, and she could not physically complete her tasks and Dr. L.M.L. summarized a third-party report of Plaintiff's symptoms. (Tr. 127-28). Dr. L.M.L. concluded that the additional medical evidence did not demand greater limitations than already opined and that Plaintiff had "mild limitations in her global functioning." (Tr. 128).

### 3. Physical Residual Functional Capacity Assessment: J.S.,[8] D.O.; Karl Boatman, M.D.

On February 31, 2014, Dr. J.S. reviewed the record and opined that Plaintiff could: (1) occasionally lift and/or carry 50 pounds; (2) frequently lift and/or carry 25 pounds; (3) stand and/or walk for a total of about 6 hours in an 8-hour workday; (4) sit for a total of about 6 hours in an 8-hour workday; (5) push and/or pull without imitation, other than shown, for her limitation with

---

[8] The agency reviewing psychologist is only identified in the record by initials.

lifting and carrying. (Tr. 117). Dr. J.S. opined that Plaintiff did not have any postural limitations, manipulative limitations, visual limitations, communicative limitations, or environmental limitations. (Tr. 117). In support for the opinion, Dr. J.S. noted Plaintiff's: (1) medical history, report of symptoms and ADLs; (2) objective testing including x-rays, CTs, MRIs, and MR angiograms for the chest, head, brain, cervical spine, knee from April 2013 to November 2013; (3) unremarkable June 2012 examination; (4) a June 2013 examination where Plaintiff reported falling twice and hitting her head followed by experiencing photosensitivity, hearing sensitivity, sharp pain in the back of the eye whenever she tries to recall something and neurological examination revealed no involuntary movements, no tremor, no dysmetria, absent Balance/Romberg's sign, and revealed that Plaintiff was able to walk a straight line and had a normal gait. (Tr. 117-118). Dr. J.S. summarized June 2013 to August 2013 examination findings from Mercy St. John that demonstrated (1) normal coordination, visual field, facial muscle functions and reflexes; (2) that her right eye upper eyelid exhibited mild droopiness; (3) stable gait; (4) a motor strength of 4 to 5/5; (5) normal sensory; (6) unremarkable mental status, and; (7) that her headaches were well controlled with a pamelor/naproxen regime and her visual disturbances and migraine were improved and controlled. (Tr. 118). Dr. J.S. noted the November 2013 examination where notwithstanding Plaintiff's reported symptoms, there were no neurological symptoms, no dizziness, no lightheadedness, no fainting, no confusion or disorientation, and no sensory disturbances. (Tr. 118). Dr. J.S. concluded that Plaintiff:

> retains the capacity to perform work related activities consistent with the RFC provided based on the [medical evidence of record] and ADL findings. [Plaintiff's] overall medical information is mild in nature. She does consistently report headaches but this is manage [sic] with med[ication]. Based on medical evidence in file, limitations with hearing, seeing and memory are overall normal.

(Tr. 118). Dr. J.S. opined that although Plaintiff demonstrated some limitations in performance of certain work activities, she was capable of doing past relevant work. (Tr. 119).

On July 22, 2014, Dr. Boatman reviewed the record and made identical findings and provided identical explanation and summary of the evidence as provided in Dr. J.S.'s February 2014 Physical Residual Functional Capacity Assessment. Compare (Tr. 117-119) with (Tr. 129-31). Dr. Boatman reviewed additional evidence which included: (1) Records from Freeman Neurospine dated March 2014 indicating that Plaintiff had obstructive sleep apnea and recommending treatment with a CPAP machine and to avoid depressive medications especially before sleeping; (2) February 2014 record indicated mild L5-S1 lumbar spine facet arthopathy, unremarkable MRI of lumbar spine, examination revealing abnormalities in the lumbosacral spine such as tenderness to palpation and left-sided antalgic gait; (3) Plaintiff's March 2014 report of hand tremors that significantly diminish ability to write and eat and that tremors happen after she works a bit; (4) a March 2014 examination noting no abnormalities in the neck, normal movement in all extremities, recommendation that Plaintiff only work two to three hours until she recovered from the traumatic brain injury; (5) an April 2014 record indicating normal movement of all extremities and Plaintiff's report of insomnia, tremor, and fatigue; (6) a June 2014 record indicating normal movement in all extremities, Plaintiff report of insomnia, rash, fatigue and depression, and nutritional evaluation results were reviewed, and; (7) a June 2014 excision of a keratosis. (Tr. 130-31). Dr. Boatman also noted Plaintiff's and third-party reports of ADLs which included preparing light meals, light chores, shopping, reading, going to church, and watching TV and significant decreased ability to hold a pen, use a computer mouse, put on make-up, or type due to tremors. (Tr. 131). Dr. Boatman concluded that the additional evidence did not demand greater limitations than already opined. (Tr. 131). Notwithstanding the recommendation that Plaintiff only

work two to three hours until she recovered from the traumatic brain injury, Dr. Boatman indicated that there was not any medical source or other source opinions about Plaintiff's limitations that needed to be addressed. (Tr. 131). Dr. Boatman reiterated the same conclusions of Dr. J.S. that although Plaintiff demonstrated some limitations in performance of certain work activities, she was capable of doing past relevant work. (Tr. 132).

### 4. Grand Lake Family Medicine: Aunna Herbst, D.O.

From July 15, 2011 to June 13, 2014, Plaintiff sought treatment from Grand Lake Family Medicine. (Tr. 359-424, 573-619). On July 15, 2011, Plaintiff reported back pain and was assessed with muscle spasms. (Tr. 359-60). On August 1, 2011, Plaintiff reported experiencing periodic migraine headaches which last for about three days affecting the right side of her face and neck. (Tr. 361). Plaintiff reported that there had been three months when she had not had these migraines but lately she has had them every month. (Tr. 361). Dr. Herbst prescribed alprazolam and sumatriptan succinate. (Tr. 362). On September 30, 2011, Plaintiff reported experiencing a headache for three days and Dr. Herbst continued with current treatment. (Tr. 363-64). On November 4, 2011, Plaintiff reported experiencing headache and fatigue and Dr. Herbst adjusted Plaintiff medication. (Tr. 365-66). On December 27, 2011, January 10, 2012, July 1, 2012, July 15, 2012, October 2, 2012, November 15, 2012, December 11, 2012, and Plaintiff sought follow-up treatment for symptoms not at issue in this case. (Tr. 367-374, 384-385, 391-401) (depression, anxiety, knee injury).

On January 26, 2012, Plaintiff reported experiencing insomnia Dr. Herbst assessed her with fatigue. (Tr. 375-77). On April 26, 2012, Plaintiff reported feeling achy all over and it was noted that Plaintiff is still waiting for insurance before she could follow up with an endocrinologist. (Tr. 378-80). On June 8, 2012, Plaintiff reported improvement since starting thyroid medication,

reported that she still experienced fatigue, it was noted that she is sleeping with the prescribed medication, and Dr. Herbst counseled her on lifestyle changes with diet and exercise. (Tr. 382-83). On September 10, 2012, Plaintiff reported that she still experiences headaches and that she had a two-day migraine the previous week. (Tr. 386). Dr. Herbst renewed Plaintiff's prescription for sumatriptan succinate to address the migraines. (Tr. 387).

A record dated June 6, 2013, noted that Plaintiff had knee surgery on May 6, 2013. (Tr. 402). Plaintiff reported that since recently twice falling and hitting head, she has experienced periodic light and hearing sensitivity which creates a sharp pain in back of eye when she is tries to recall something. (Tr. 402). Upon examination, Dr. Herbst noted normal movement of all extremities, no involuntary movements, no tremor, no dysmetria, Rornberg's sign was absent, that Plaintiff was able to walk a straight line, stance and gait were normal, and her deep tendon reflexes were normal. (Tr. 404).

On September 10, 2013, Plaintiff reported that she was still under a neurologist treatment due to her concussions and her main concern was insomnia. (Tr. 406). Upon examination, Dr. Herbst noted no arthralgias, no localized joint pain, no neurological symptoms, no dizziness, no lightheadedness, no fainting, and no sensory disturbances. (Tr. 407). Dr. Herbst noted that Plaintiff's remote memory was not impaired, recent memory was not impaired, cranial nerves were normal, no sensory exam abnormalities were noted, a motor examination demonstrated no dysfunction, no ataxic gait was observed, and reflexes were normal. (Tr. 408).

On October 7, 2013, Dr. Herbst noted no musculoskeletal symptoms, no limb swelling, and no neurological symptoms. (Tr. 411-12). On October 14, 2013, Plaintiff reported back pain for past couple of days, and Dr. Herbst noted that Plaintiff was not fatigued, did not experience

lightheadedness, no decrease in ability to concentrate, and normal movement in all extremities. (Tr. 414-16).

On November 6, 2013, Plaintiff reported experiencing memory loss from the May 2013 car accident and described that she thought her symptoms were getting better; however, she still had difficulty recalling the days of the week, still occasionally walked sideways, and drove off the road when she thought that she was driving straight. (Tr. 418). Dr. Herbst noted that Plaintiff reported fatigue but no headache, no arthralgias or localized joint pain, and Plaintiff was presented normal movement of all extremities. (Tr. 420).

On July 23, 2014, Plaintiff reported experiencing a migraine for five days and experiencing fatigue. (Tr. 623, 625). Plaintiff reported arthralgias and pain in one or more joints and that tremors were stable, and she experienced no dizziness, lightheadedness, or confusion. (Tr. 625). Examination revealed no back tenderness, normal movement of all extremities, and normal musculoskeletal examination in general. (Tr. 626). It was noted that Divalproex Sodium was discontinued. (Tr. 623). Dr. Herbst noted that Plaintiff's remote and recent memory were not impaired, Plaintiff demonstrated a normal sensory examination, normal reflexes, no dysfunction during the motor examination, and walked with a normal gait. (Tr. 626).

On August 19, 2014, Plaintiff sought treatment for extreme fatigue and headaches. (Tr. 627). Plaintiff reported experiencing headaches with greater frequency and duration. (Tr. 627). Plaintiff reported keeping a headache diary and that she saw Dr. Harden regarding the tremors and he prescribed medication and opined that the tremors were due to fatigue. (Tr. 627). As with the prior visit, Plaintiff reported that the tremors were stable, that she experienced no dizziness, no decrease in ability to concentrate, no fainting, no confusion, and no sensory disturbances. (Tr. 629). Dr. Herbst's observations were identical to the July 2014 examination noting that

examination revealed no back tenderness, normal movement of all extremities, and normal musculoskeletal examination in general, that Plaintiff's remote and recent memory were not impaired, that Plaintiff demonstrated a normal sensory examination, normal reflexes, no dysfunction during the motor examination, and walked with a normal gait. (Tr. 630). Dr. Herbst recommended increasing the dosage of her current medication in hopes to decrease the headaches. (Tr. 630).

On September 9, 2014, Plaintiff sought treatment for reccurring headaches and brought in her migraine log. (Tr. 632). Plaintiff was unsure whether she should take the medication daily, or just on the days that she experienced the migraines. (Tr. 632). Plaintiff reported feeling disoriented before the migraines start and that she experienced fatigue and depression. (Tr. 632). As with the prior visit, Plaintiff reported that no dizziness, no fainting, no confusion, and no sensory disturbances. (Tr. 634). Dr. Herbst observed normal movement of all extremities. (Tr. 634). Dr. Herbst instructed Plaintiff to take medication every night. (Tr. 635).

On October 7, 2014, Plaintiff reported seeking emergency department treatment for a severe migraine which caused her to feel dizzy and fall. (Tr. 636), (Tr. 772- (Emergency Hospital Records)). Dr. Herbst reviewed Plaintiff's migraine log. (Tr. 638).

On November 4, 2014, Plaintiff reported that she had a migraine on October 31, 2014, that lasted for twenty-four hours, she reported that it started when she was driving, causing her to pull out in front of people, and hit the railing of her porch without being aware of what happened. (Tr. 640). Plaintiff speculated that the headache from the day before caused that "foggy spell" during driving and denied any other foggy spells, for example during cooking, cleaning, or other household chores. (Tr. 640). Plaintiff reported that time and rest in a quiet place was the best way to alleviate her headaches. (Tr. 640). Upon review of symptoms, Plaintiff was not fatigued, did not

experience visual problems, did not report any musculoskeletal symptoms, and did not experience dizziness. (Tr. 642). Dr. Herbst reviewed Plaintiff's migraine log and instructed Plaintiff "not to drive on days that she has had a headache or a day after if she is feeling foggy." (Tr. 643). Dr. Herbst continued Plaintiff's medication of 25 mg of Sumatriptan daily for normal headaches and increasing the dosage for major headaches that last a day. (Tr. 643).

On December 8, 2014, Plaintiff reported currently experiencing a migraine that has lasted three days and reported that she had a bad migraine for two days and went a week without one. (Tr. 644). Plaintiff reported that her headaches are not lasting as long as they have before. (Tr. 644). Plaintiff reported that her headaches were triggered by weather change and lights when traveling, her main concern is that she cannot sleep, and she reported feeling very stressed with her headaches and caring for her husband. (Tr. 644). Upon examination, Dr. Herbst noted that notwithstanding the headache, Plaintiff had no vision problems, no nausea, no dizziness, no impairment of the remote memory and recent memory, and her mood reflected her experiencing pain. (Tr. 646-47). Dr. Herbst recommended to try muscle relaxers when the headaches were severe and causing her not to sleep. (Tr. 647).

On January 2, 2015, Plaintiff reported that the cyclobenzaprine was reducing the duration of her headaches to one day. (Tr. 648). Plaintiff reported experiencing fatigue and a headache. (Tr. 649). Dr. Herbst noted that Plaintiff did not exhibit any indication of joint pain or neurological symptoms and noted that Plaintiff's migraines were stable, and fatigue remained the same. (Tr. 650-51).

On February 3, 2015, Plaintiff brought her migraine log, reported experiencing twelve migraines in a month, and reported experiencing an anxiety attack that morning and taking two Xanax pills in response. (Tr. 652). Plaintiff reported that amitriptyline alleviates the duration of

the migraines, but not the severity. (Tr. 652). Plaintiff reported no fatigue, headache, no neurological symptoms, and no musculoskeletal symptoms. (Tr. 654). Dr. Herbst referred Plaintiff to a neurology specialty to address headaches and traumatic brain injury. (Tr. 655).

On March 5, 2015, Plaintiff reported that she did not see the neurologist the day prior and stated that she wanted to see a different doctor and would research and recommend a preferable doctor. (Tr. 656). Plaintiff reported that she experienced headaches for the past three days and upon the onset of a headache, she experiences blurred vision and dizziness. (Tr. 656). Plaintiff also reported experiencing lower back pain for a week which is exacerbated by bending and Alieve did not alleviate the pain. (Tr. 656). Dr. Herbst noted that Plaintiff's lumbosacral spine exhibited no spasms and Plaintiff exhibited a full range of motion of the lumbosacral spine without any pain. (Tr. 658). Dr. Herbst noted that a piriformis test of the hips was positive and demonstrated spasms. (Tr. 658). Dr. Herbst noted that Plaintiff's motor strength, toe walking, and gait were normal. (Tr. 658). Dr. Herbst demonstrated exercises, recommended using ice and stretching, and discussed an option for steroid injections. (Tr. 658).

On April 3, 2015, Plaintiff reported that medication did not help to dissipate a headache which lasted from March 14 to March 17 and caused dizziness and lightheadedness. (Tr. 661). Plaintiff reported that her headaches tend to occur every seven to eight days and she has noticed personality changes since her traumatic brain injury. (Tr. 661). Plaintiff reported experiencing occasional light flashing in her left eye when laying down that seems unrelated to a migraine, however, she will have a migraine the next day. (Tr. 661).

On May 1, 2015, Plaintiff reported that she fell again and hit her head on a rock, she sought emergency department treatment, and was diagnosed with a concussion. (Tr. 667), (Tr. 682-87). Plaintiff reported that she had a migraine after hitting her head and her tremors worsened after

hitting her head. (Tr. 667). Plaintiff reported that she had five migraines in the last month, each lasting ten hours to one day. (Tr. 667). However, one migraine lasted five days and she did not recall ever having a migraine that lasted for that long. (Tr. 667). Upon examination, Dr. Herbst noted that there was "[n]o evidence of a head injury," there was tenderness upon palpation to the right side of the head, neurological examination was normal, and Dr. Herbst recommended to continue medication and headache diary. (Tr. 669-70).

### 5. Treating Physician Opinions: Aunna Herbst, D.O.

In a letter dated April 22, 2014, Dr. Herbst wrote that Plaintiff:

> was diagnosed with a traumatic brain injury; she suffers from memory loss, constant migraines, and tremors. She has sought medical attention from a number of specialists and me for this condition. I do not recommend that [Plaintiff] is employed due the worsening of her conditions.

(Tr. 551). Dr. Herbst concluded that she was available to answer questions or provide more information, if necessary. (Tr. 551).

In a form dated August 19, 2014, Dr. Herbst indicated that Plaintiff experienced one to two headaches per week which would last, on average forty-eight hours. (Tr. 660). Dr. Herbst opined that Plaintiff's typical headaches were disabling because the headaches caused blurred vision, nausea/vomiting (only one time in the last month), and rendered Plaintiff unable to maintain focus/concentration to complete even simple tasks and unable to leave her home due to sensitivity to light and sound. (Tr. 660). Dr. Herbst added that the functional limitations due to the headaches also exacerbate Plaintiff's depression. (Tr. 660). Dr. Herbst opined that the headaches were the result of traumatic brain injury. (Tr. 660).

In a form dated June 8, 2015, Dr. Herbst indicated that Plaintiff experienced five to eight headaches per week which would last, on average twenty-four to forty-eight hours. (Tr. 688). Dr. Herbst opined that Plaintiff's typical headaches were disabling because the headaches caused

blurred vision, nausea/vomiting, and rendered Plaintiff unable to maintain focus/concentration to complete even simple tasks and unable to leave her home due to sensitivity to light and sound. (Tr. 688). Dr. Herbst again opined that the headaches were the result of traumatic brain injury. (Tr. 688).

### 6. Freeman Neurospine: Jason Maxfield, M.D.

On January 20, 2014, Dr. Maxfield summarized Plaintiff's medical history and report of symptoms. (Tr. 525-26). Upon examination, Dr. Maxfield, noted that notwithstanding Plaintiff's report of lack of sleep, she did not appear fatigued. (Tr. 527). Dr. Maxfield noted that Plaintiff's neurological examination was generally normal, with full motor strength, normal deep tendon reflexes, normal coordination, and normal gait. (Tr. 527). Dr. Maxfield recommended starting Plaintiff on Depakote. (Tr. 527).

On June 20, 2014, Dr. Maxfield noted that he prescribed Depakote to treat Plaintiff's headaches and Plaintiff reported that the medication was very helpful, however, she quit taking the medication. (Tr. 690). Dr. Maxfield noted that although Plaintiff attributed a forearm rash to Depakote, the "rash did not start until about 4 months on this medication," and "[d]espite discontinuation of Depakote about 1 month ago she still ha[d] the rash." (Tr. 690). Dr. Maxfield summarized that:

> [Plaintiff] has developed this rash of unclear etiology. Its timing does not correlate with starting the medication and still persist one month after discontinuation. She is undergoing continuing medication changes for her mental health by her provider at the Ozark Center. At her follow-up visit in 2 weeks we will discuss restarting Depakote for her headaches.

(Tr. 691). Listed medications included Sumatriptan succinate and Divalproex Sodium (Depakote)[9] for treating her chronic migraines. (Tr. 691).

**7. Integris Grove Regional Hospital: Douglas Cox, M.D.; Rita Shewmake, APRN-CNP; Michael Eastman, D.O.[10]**

On October 1, 2014, Plaintiff sought emergency treatment for a severe headache following a fall. (Tr. 672-75). Dr. Cox noted that "[b]ased on the date of her prescription bottle [Plaintiff] may have been overusing some of her benzodiazepines," that she was lethargic and "seem[ed] overmedicated." (Tr. 675). From the musculoskeletal examination, Dr. Cox noted that she had a normal range of motion with some mild spasticity upon purposeful movement. (Tr. 676). Dr. Cox noted no focal neurological deficit. (Tr. 676). CT scan of the head was normal. (Tr. 678).

On April 27, 2015, Plaintiff sought emergency treatment following hitting her head on a rock from a fall. (Tr. 682). Ms. Shewmake noted that Plaintiff had abrasions, muscle pain and back contusion, headache, dizziness, and sleeping problems. (Tr. 682). Dr. Eastman noted swelling and tenderness on the right side of Plaintiff's head, Plaintiff demonstrated a full range of motion of the spine and throughout the rest of the musculoskeletal examination, and neurological examination was normal. (Tr. 684). Dr. Eastman diagnosed Plaintiff with head injury and contusions of the head and chest. (Tr. 684). CT scan of head was normal. (Tr. 685).

**8. Testimony and Function Report**

In the function report dated December 19, 2013, Plaintiff reported that since her concussion, she had been unable to work on a computer for more than two hours without triggering

---

[9] An emergency record dated March 13, 2014, also listed Divalproex Sodium as one of Plaintiff's current medications. (Tr. 540).

[10] The number of pages in the record is less than the number of pages (thirty-seven for the October 2014 visit and twenty-five pages for the April 2015 visit) indicated from the hospital records.

a migraine and that, at time, she experienced photosensitivity, blurred vision, difficulty reading, and confusion. (Tr. 259). Plaintiff reported that during her migraines she remains in bed in the dark until the pain subsides. (Tr. 260). When she does not have a migraine, she can do a little housework, drive to the store, take care of her hygiene, and other similar activities of daily living. (Tr. 260). Plaintiff reported that she cares for their dog and helps her husband carry things due to his mobility limitations. (Tr. 260). Plaintiff reporting experiencing insomnia and then after a migraine she would sleep for twenty-four hours. (Tr. 260). Plaintiff reported that she had no problem with personal care, she prepares her own meals three to four days a week, and is able to do household chores when she does not have a headache. (Tr. 260-61). Plaintiff reported that her husband reminds her to take her medicine. (Tr. 261). Plaintiff stated that when she does not have a headache, she goes outside daily, by walking, driving, or riding in a car. (Tr. 262). Plaintiff indicated that she shops one hour bi-weekly, was able to count change, handle a savings account, use checks, but sometimes forgets to pay a bill. (Tr. 262-63). Plaintiff reported that she read and watches TV daily, however, she could not read as long due to vision becoming blurred, and puzzles cause her headaches to return. (Tr. 263). Plaintiff reported that she socialized daily, advised clients if they call her at home, and she does not need someone to accompany her when she goes out weekly to church, a grocery, store, or a restaurant. (Tr. 263). Plaintiff reported that she gets dizzy and has panic attacks when she is in large crowds, could not keep lunch appointments with friends, and was unable to go to her son's wedding shower due to her condition. (Tr. 264). Plaintiff reported that she could not sit at a computer for long periods of time because doing so causes blurred vision, she forgets numbers, experiences difficulty with simple office machines, difficulty with seeing, memory, completing tasks, concentration, and using her hands. (Tr. 264). Plaintiff reported that

she could walk a mile before needing to stop and rest, that she could pay attention for two hours, could efficiently follow written instructions, and forgets spoken instructions. (Tr. 264).

During the July 2015 hearing, Plaintiff testified that she worked at her business a half a day a week during the recent year and that her business gave her approximately a thousand dollars a month during tax season. (Tr. 55, 63). Plaintiff asserted that the money she received from her business was not earned money, explaining that it was given to her if she needed money for living expenses. (Tr. 55, 63). Plaintiff testified that she still has her driver's license, she generally did not drive for twenty-four hours after a headache, and she drove approximately two to three days a week. (Tr. 66-68). Plaintiff testified that she traveled to Arkansas for a religious convention, Missouri due to a death in the family, and went to religious gatherings once a week, however, the ALJ did not asked how she got to these places. (Tr. 68-70).

### III. Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits under the Act, a claimant bears the burden to demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord 42 U.S.C. § 1382c(a)(3)(A). The Act further provides that an individual:

> shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Plaintiff must demonstrate the physical or mental impairment "by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750. The claimant bears the burden of proof at steps one through four. See Wells v. Colvin, 727 F.3d 1061, 1064 at n.1. (10th Cir. 2013). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. Id.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See e.g., 42 U.S.C. § 405(g) ("court shall review only the question of conformity with such regulations and the validity of such regulations"); Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the [Administrative Law Judge's] findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172

(10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## A.      ALJ's Weight of Medical Opinions

Plaintiff asserts that the ALJ erred in evaluating the treating source opinions. (Pl. Brief at 6-9). In the August 2015 decision, the ALJ explained:

> Dr. [Herbst], submitted a letter on behalf of [Plaintiff] on April 22, 2014. She stated [Plaintiff] was diagnosed with a traumatic brain injury and she suffered from memory loss, constant migraines, and tremors. She sought medical attention from a number of specialists and herself for her conditions. She did not recommend Ms. Dysart be employed due to worsening of her conditions.

> I accord little weight to Dr. Herbst's letter submitted on Ms. Dysart's behalf because it is inconsistent with the records.

> On March 21, 2014, Dr. Herbst found [Plaintiff's] mental status, attitude, and affect were normal. [Plaintiff's] thought processes and thought content were not impair[ed].

> On April 8, 2014, the appointment before Dr. Herbst wrote the letter, Dr. Herbst found [Plaintiff] was awake with no resting tremor; she was alert, oriented times three, and no acute stress. [Plaintiff] had normal movement with all of her extremities. Dr. Herbst's opinion appears to be based on subjective complaints made by [Plaintiff] and not on her examination and thus is given little weight.

> Office treatment records on June 10, 2014, Ms. Dysart complained of insomnia and depression. She reported she was more depressed because of the tremors. On examination, she was awake, alert, oriented times three, and in no acute distress. She had normal movements of all her extremities. Dr. Herbst's assessment was insomnia, rash, fatigue, and depression.

> Dr. [Herbst], completed a representative-created *Medical Source Opinion* (that is, not on a form approved by the Social Security Administration; hence, not complete) on September 19, 2014. She stated [Plaintiff] had recurrent headaches one to two times a week. The average length of headache was 48 hours and [Plaintiff's] typical headache was disabling. When she had those headaches she was unable to maintain focus/concentration to complete even simple tasks, unable to leave her room or house due to sensitivity to light, sound, etc. . . . , blurred vision, and nausea/vomiting (but only one time in the last month). Dr. Herbst stated [that

the reason for the headaches was] traumatic brain injury. As noted above, repeated brain scans of multiple types were all negative.

(Tr. 22) (internal citations omitted). The ALJ continued, explaining:

>Dr. Herbst . . . again completed yet another representative-created *Medical Source Opinion* (again, not a Social Security Administration form; hence, as before, incomplete) on June 8, 2015. She stated, [Plaintiff] had recurrent headaches that were five to eight times a week. The average length of headache was 24-48 hours and Ms. Dysart's typical headache was disabling.

>When she had such headaches, Dr. Herbst opined [Plaintiff] was unable to maintain focus/concentration to complete even simple tasks, unable to leave her room or house due to sensitivity to light, sound, etc. . . . , blurred vision, and nausea/vomiting. She did not provide any other limitations associate with typical headaches. Dr. Herbst stated [Plaintiff's] reason for her headaches were status posttraumatic brain injury. Again, I note the repeated negative findings in that regard.

(Tr. 23) (internal citations omitted). The ALJ further determined:

>I accord great weight to the State Disability Determination Service ("DDS") doctors' findings that [Plaintiff] was capable of returning to her past relevant work because it is consistent with medical examinations in her file. Specifically, her level of consciousness was normal and her recent and remote memory was not impaired. [Plaintiff's] speech was normal and her motor function demonstrated no dysfunction with normal strength. She did not have an ataxic gait. [Plaintiff] had a euthymic mood.

(Tr. 27) (internal citations omitted). The undersigned finds that substantial evidence does not support the ALJ's allocation of weight to the medical opinions.

"Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2). Medical opinions can come from various sources, including treating physicians, examining physicians, and non-examining physicians. 20 C.F.R. §§ 404.1527(c)(1)-(2). Statements on issues reserved to the Commissioner and statements from sources who are not acceptable medical sources are excluded from the

definition of "medical opinion." <u>See</u> 20 C.F.R. §§ 404.1527(a)(2); 404.1527(d). Treating sources

are those who have "seen [the claimant] a number of times and long enough to have obtained a

longitudinal picture of [the claimant's] impairment" ("treating source rule"). <u>See</u> 20 C.F.R. §

404.1527(c)(2). The Regulations generally require the ALJ to "give more weight to opinions from

[a claimant's] treating sources" ("treating source rule"). 20 C.F.R. § 404.1527(c)(2); <u>see also</u>

Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932-01 at

*36936. If "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's]

impairment(s)" is both "well-supported by medically acceptable clinical and laboratory diagnostic

techniques" and "not inconsistent with the other substantial evidence," the ALJ must "give it

controlling weight." 20 C.F.R. § 404.1527(c)(2); <u>Mays v. Colvin</u>, 739 F.3d 569, 574 (10th Cir.

2014) (quoting <u>Robinson v. Barnhart</u>, 366 F.3d 1078, 1082 (10th Cir. 2004)). Pursuant to Social

Security Ruling ("SSR") 96-5p:

> Although the overall RFC assessment is an administrative finding on an issue
> reserved to the Commissioner, the adjudicator must nevertheless adopt in that
> assessment any treating source medical opinion (i.e., opinion on the nature and
> severity of the individual's impairment(s)) to which the adjudicator has given
> controlling weight under the rules in 20 CFR 404.1527(d)(2) and 416.927(d)(2).

<u>Id.</u>[11] Consequently, a well-supported treating source medical opinion that is not inconsistent with

other substantial evidence binds the ALJ. <u>Cf.</u> 20 C.F.R. § 404.1527(e)(2)(i) ("Administrative law

judges are not bound by any findings made by State agency medical or psychological consultants,

or other program physicians or psychologists").

Once an ALJ determines that pursuant to paragraph (c)(2) controlling weight is not

warranted for a treating source opinion, the ALJ can then allocate weight between treating source

---

[11] Social Security Rulings are "binding on all components of the Social Security Administration."
20 C.F.R. § 402.35(b)(1).

opinions, examining, and non-treating physician opinions. See 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2); Watkins v. Barnhart, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (explaining the sequential analysis). Generally, there is a hierarchy of weight allotted between three types of physician opinions: opinions of those who treat the claimant (treating physicians) are given more weight than opinions by those who examine but do not treat the claimant (examining physicians), and the opinions of examining physicians are given greater weight than the opinions of those who neither examine nor treat the claimant (non-examining physicians). See 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2).[12]

In "appropriate circumstances" an ALJ may apply paragraphs (c)(3) through (c)(6) to assign less weight to a treating source opinion in favor of a non-treating, non-examining medical opinion. See SSR 96-6p;[13] 20 C.F.R. §§ 404.1527(c), 416.927(c). Although not defining "appropriate circumstances," SSR 96-6p provides as an example that:

> the opinion of a State agency medical or psychological consultant or other program physician or psychologist may be entitled to greater weight than a treating [source's] medical opinion if the State agency medical or [psychological] consultant's opinion is based on a review of a complete case record that includes a medical report from a specialist in the individual's particular impairment which provides more detailed and comprehensive information than what was available to the individual's treating source.

---

[12] Social Security Ruling 96-6p explains that:
> The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker. For example, the opinions of physicians or psychologists who do not have a treatment relationship with the individual are weighed by stricter standards, based to a greater degree on medical evidence, qualifications, and explanations for the opinions, than are required of treating sources.

SSR 96-6p.

[13] The ALJ is bound by SSR 96-6p. See 20 C.F.R. § 402.35(b)(1) (Social Security Rulings are "binding on all components of the Social Security Administration").

SSR 96-6p. This example does not constitute the only possible appropriate circumstance to assigning greater weight than a treating medical opinion, but the phrase "appropriate circumstances" should be construed as a similarly compelling reason. See Ali v. Fed. Bureau of Prisons, 552 U.S. 214, 223, 128 S. Ct. 831, 838, 169 L. Ed. 2d 680 (2008) ("when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration"). The example suggests that even an opinion of an agency physician that is based on a reinterpretation of the same evidence considered by the treating source physician is insufficient to grant the agency opinion greater weight over that of the treating source opinion. See SSR 96-6p. Generally,for an agency physician opinion to be granted more weight than the treating source opinion,  there needs to be additional material evidence that was not considered by the treating source physician. See SSR 96-6p.

When "appropriate circumstances" do not exist, then the ALJ lacks substantial evidence to find that a non-examining physician opinion outweighs a treating source opinion pursuant to 20 C.F.R. 404.1527(c)(2). See Larkins ex rel. M.D. v. Colvin, 568 F. App'x 646, 649 (10th Cir. 2014); Daniell v. Astrue, 384 F. App'x 798, 803 (10th Cir. 2010) (expressing concern when a consultant's opinion was not based upon review of a complete case record); D'Armond v. Colvin, No. 14-4086-SAC, 2015 WL 7312439, at *6 (D. Kan. Nov. 19, 2015) (discussing cases addressing "appropriate circumstances").

Since the most recent non-examining opinions from July 2014 (Tr. 122-31), the following significant evidence and medical opinions occurred: (1) Dr. Herbst's August 2014 opinion (Tr. 660); (2) Plaintiff had sought emergency department treatment in October 2014, for a severe migraine which caused her to feel dizzy and fall (Tr. 636, 672-75), (Tr. 772 (Emergency Hospital Records)); (3) in November 2014 Plaintiff reported a migraine event while driving that posed a

danger to herself and others and Dr. Herbst instructed Plaintiff not to drive on days that she has had a headache or a day after "if she is feeling foggy" (Tr. 640-43); (4) in April 2015, Plaintiff sought emergency department treatment due to falling and hitting her head on a rock, and was diagnosed with a concussion (Tr. 667, 682-87), and; (5) Dr. Herbst's June 2015 opinion (Tr. 688). In light of the post July 2014 evidence, "appropriate circumstances" do not exist to support to favoring the non-examining opinions over the treating source opinions. See Larkins ex rel. M.D., 568 F. App'x at 649; Daniell v. Astrue, 384 F. App'x 798, 803 (10th Cir. 2010); D'Armond, No. 14-4086-SAC, 2015 WL 7312439, at *6.

With regard to the perceived inconsistencies with the treating source opinion, the ALJ had a duty to recontact Dr. Herbst. As the Administration explained:

> Some commenters were concerned that the proposed language of §§ 404.1527(b) and (c), and 416.927(b) and (c) permitted us to discount a treating source's apparently unsupported opinion without recontacting the source, and that the rules placed highly restrictive conditions on obtaining additional information from treating sources.
>
> Response: To the contrary, recontact with treating sources to complete the case record and to resolve any inconsistencies in the evidence is one of the principal provisions of this set of rules. See §§ 404.1512(d) and 416.912(d) of these final regulations. Far from being restrictive, the intent of these rules is to require such contacts.

Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932–01, 36951–36952; see also 20 C.F.R. § 404.1512(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports"); SSR 96-5p ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion").

The ALJ points out various issues that would be appropriate for the treating source to clarify through the "recontact" provision, such as: (1) how can frequent debilitating headaches referenced in the opinion exist with normal examinations during periodic doctor's visits; (2) whether a diagnosis of traumatic brain injury is contradicted by the radiological and other diagnostic tests that are normal; (3) whether there exist any medical explanations for Plaintiff discontinuing different treatments that were noted to be effective as demonstrated in Dr. Sharma's August 2013 opinion that Plaintiff's visual disturbances and migraine were improved and "well controlled over pamelor/naproxen regime" (Tr. 353) and in Dr. Maxfield's June 2014 note that Depakote was helpful to treat Plaintiff's headaches and Plaintiff's reason for stopping the medication was unrelated to a verifiable side-effect (Tr. 690-91); and, (4) the significance, if any, of Dr. Cox's October 2014 observation that Plaintiff may have been overusing some of her benzodiazepines and that "she was lethargic and 'seem[ed] overmedicated'" (Tr. 675). See Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932–01, 36951–36952; SSR 96-5p. There is no evidence in the record that the ALJ attempted to recontact Dr. Herbst.[14]

Given the abovementioned evidence not considered by the non-examining physicians and the need for clarification of the treating source opinion, the ALJ has not provided "good reasons" nor has the ALJ identified "appropriate circumstances" to assign greater weight to the non-examining opinions (Dr. G.R.L.'s February 2014 psychiatric opinion (Tr. 113-116), Dr. L.M.L.'s July 2014 psychiatric opinion of (Tr. 122-27), Dr. J.S.' February 2014 physical RFC assessment (Tr. 117-119), and Dr. Boatman's July 2014 physical RFC assessment (Tr. 129-31)), over the

---

[14] To conserve time and resources, once the need for clarification becomes apparent from an ALJ decision, a claimant could also seek an additional treating physician opinion addressing any ambiguities in the record and submit the additional opinion to the Appeals Counsel.

opinions of Dr. Herbst (from April 2014 (Tr. 551), August 2014 (Tr. 660), and June 8, 2015 (Tr. 688)).

**B.     Other Allegations of Error**

Plaintiff's additional claims of error may be remedied through the case's treatment on remand, and, thus, the undersigned declines to address those claims. Accord Williams v. Colvin, No. CIV-13-448-R, 2014 WL 2949470, at *4 (W.D. Okla. June 27, 2014); see, e.g., Wade v. Astrue, 268 F. App'x 704, 706–07 (10th Cir. 2008); Watkins, 350 F.3d at 1299.

## CONCLUSION

For the foregoing reasons, the ALJ's decision finding Plaintiff not disabled is **REVERSED and REMANDED** for further proceedings.

SO ORDERED this 27th day of July, 2017.

**Gerald B. Cohn**
**United States Magistrate Judge**